| | | |
|---|---|---|
| JAMES PATTERSON, | ) | CASE NO. 5:17CV01699 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| vs. | ) | |
| | ) | |
| | ) | **OPINION AND ORDER** |
| STARK COUNTY, OHIO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 on behalf of Defendants Stark County, Ohio and Stark County Commissioners, Sheriff George T. Maier, Lt. Rick Ady, Sgt. Keith Evanoff, Sgt. Eric Changet, Sgt. James Stevic, Sgt. Bryan Burress, CO Michael Smith, CO Paul Boggs, CO Jason Skelley, CO Brian Pittman, and, CO Ryan Jones (collectively, "Defendants"). (Doc. # 103). Plaintiff James Patterson has opposed the motion, and Defendants have replied in support.[1] For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

I. **BACKGROUND**

A. **Factual Background**

James Patterson reported to the Stark County jail on the morning of August 23, 2016. Patterson Dep., Mar. 1, 2018 35:22-24, Doc. # 107-7. He was to serve a ten-day sentence for his conviction in Canton Municipal Court for one count of Unauthorized Use of a Motor Vehicle, a

---

[1] Based upon the state of the record, the Court will analyze the motion under the summary judgment standard.

first-degree misdemeanor. Compl. ¶ 19, Doc. # 85. At that time, Stark County contracted with Correctional Healthcare Group Inc. to provide medical treatment to inmates housed at the jail. The treatment included on-site nurses that were always available and worked from the jail's medical unit. Nursing staff made at least two rounds each day in the morning and evening to provide inmates with medicine and distribute or collect medical kites.[2] Upon arrival, Patterson immediately completed a pre-screening form indicating that he suffered from several ailments. *Id.* at ¶ 20. He believes he reported taking at least four different medications. *Id.* Patterson also relayed which pharmacy he used to fill his prescriptions to jail staff. *Id.* He did not, however, bring any of his prescriptions with him when he self-reported. Patterson Dep. 37:11-24. Policies were in place at the time allowing for inmates to bring their own medication with them upon being admitted to the jail. Correctional Healthcare Group Inc., "Pharmaceuticals", P/P # 91356.00(4). Doc. # 105-6. Medical staff requested records from Aultman Clinic, which Patterson reported as his medical provider. Stump Aff. 13, Ex. 7 Doc. # 103-7. Medical records received from the clinic indicated that they had only seen Patterson one time and had not issued prescriptions for several of the drugs Patterson claimed to be taking. *Id.* Jail medical records state that nursing staff sent a request to Patterson for additional information, but he does not remember receiving it. *Id.*

On August 24, 2016, Patterson began experiencing problems with his left leg. Patterson Dep. 61:22-25. Patterson experienced symptoms in his left calf resembling that of a charley horse. *Id.* at 63:3-7. The symptoms lasted for an unknown amount of time but for at least an hour. *Id.* at 63:7-9. Patterson reported telling the nurse that was on rounds that evening about his

---

[2] A medical kite is a treatment form that could only be received and collected from the nursing staff. Inmates could use these forms to make medical complaints and request to see a medical staff member. Inmates would request forms from nurses during their rounds. They would fill them out, fold them, and place them between the bars of their cells to await collection.

symptoms, indicating that he believed it was blood clots. *Id.* at 64:16-19. The nurse responded "[w]ell, it ain't that serious right now." *Id.* at 65:1-3. Early in the morning of August 25, 2016, Patterson again reported pain in his left leg - this time to a correctional officer ("CO"). *Id.* at 68:1-5. Patterson was sitting on a table in his cell to ease the pain in his leg while CO Boggs was making rounds. *Id.* at 67:19-21. CO Boggs directed Patterson to get off the table and get in his bunk to which Patterson responded that he couldn't move because of the pain in his leg. *Id.* at 68:2-5. Patterson again relayed that he believed he was suffering from blood clots and requested to "speak to somebody about getting to the emergency room." *Id.* at 68:5-10. Boggs initially responded "[w]hat do you want me to do about it?" and further stated "[w]ell I don't F'in see that happening." *Id.* at 68:8, 12. Boggs' logs of the early morning of August 25, 2016 noted that Plaintiff twice complained of leg pain, the first time around 2:20 A.M. and again around 3:40 A.M. Doc. # 107-2. The log further indicated that a nurse was in to see him at around 5:12 A.M. that morning. *Id.* Patterson contends that he began his complaints several hours earlier, shortly after lights out. Patterson Dep. 67:14-25.

Later that morning, Patterson again reported his ailment to the nurse on rounds. *Id.* at 70:8-9. He informed the nurse about his surgeon and said that the surgeon could explain the history of his legs. *Id.* at 70:11-13. Again, he told the nurse that he believed it to be a blood clot and asked to go to the emergency room. *Id.* at 70:14-16. The nurse checked the pulse on Patterson's foot and told him that she would "keep an eye on it." *Id.* at 70:16-18. Patterson further reported the same condition to other staff members that he came into contact with throughout that day. *Id.* at 71:4-7. Patterson believes that he filled out a medical kite that day, complaining about blood clots, asking to go to the emergency room, explaining who his doctor is, and asking medical staff to call about his medical history. *Id.* at 73:11-17. Patterson did not

include a list of his current medications. *Id.* at 18-24. He put the completed form between the bars of his cell. Whether the form was ever collected is unclear, but Patterson did not get a response to it, nor was it put forth alongside other jail documentation.

Early on August 26, 2016, a few of Patterson's cell mates pressed the cell's panic button several times on his behalf. *Id.* at 76:14-22. It is unclear whether the other inmates acted out of concern or annoyance. Regardless, CO Smith and a and nurse responded. The nurse inspected his foot and felt for a pulse. *Id.* at 76:4-5. Patterson believes that at this point his foot was red and irritated. *Id.* at 77:2-4. The nurses report noted that the left lower extremity appeared ashen in color and that Patterson "limps with ambulation." Stump Aff. 13, Doc. # 103-7. Nonetheless, the tests indicated that his circulation was within normal limits and that there was no redness or swelling. *Id.* Even so, the nurse recommended that Patterson should be placed on doctor's call, and corrections staff complied. *Id.* Unfortunately, the doctor did not have time to see Patterson that day. *Id.* Instead, he was placed in medical segregation to be seen the following Monday. *Id.* CO Smith obtained a wheelchair to move Patterson at his request and, accompanied by the nurse, wheeled him to the section of the jail where medical segregation housing was located. Smith Dep., Nov. 1, 2018, 100:18-22. Doc. # 107-9.

Patterson, believing that he was being released to the hospital, was dismayed to find that he was actually being moved to medical segregation. Patterson Dep. 77:20-25. Patterson recounts that when he got there, a CO looked at his foot and remarked "Damn, is that gangrene?" *Id.* at 78:9-12. Neither CO Smith nor CO Pittman, the two officers that helped move Patterson to medical segregation, recalls hearing or making the comment. Smith Dep. 108:24-25, 109:1-5; Pittman Dep., Nov. 1, 2018 52:11-13. Doc. # 107-10. Patterson had a brief exchange with CO Pittman, stating "I need to get to the emergency room. I got a blood clot. I'm going to lose my leg

if they don't get me there." Patterson Dep. 156:16-18. Patterson reported that CO Pittman did not respond to his complaints. *Id.* at 156:19-20. The nurse was still present for this exchange. *Id.* at 156:23. CO Pittman, who was responsible for the medical segregation unit during the period in question, had no specific recollection of Patterson's stay in his area. Pittman Dep. 61:21-22. The nurse's progress notes recorded that Patterson filled out a medical kite complaining of leg pain late on August 26, 2016. Stump Aff. 13, Ex. 7 Doc. # 103-7. The form was brief and nearly illegible. *Id.* The log also indicated that there was no edema and that Patterson's capillary refill was within normal limits. *Id.* The nurse proscribed Ibuprofen to be taken three times per day until Patterson saw the doctor. *Id.* Later that night, the jail was subject to a "shakedown" due to a matter unrelated to Patterson. The shakedown was conducted by Sgt. Evanoff and several deputies. When they got to Patterson's cell, he was directed to "sit up or get up and walk out of there," so that the cell could be inspected. Patterson Dep. 158:7-10. Patterson attempted to leave the cell and in doing so was dragging his foot. *Id.* at 158:14-15. Sgt. Evanoff asked Patterson what was wrong, and Patterson responded by reiterating the summation of his complaints from the prior several days. *Id.* at 158:16-19. Sgt. Evanoff stated "[w]ell, unfortunately, these nurses don't work under me," but rather "[t]hey work through a different company." *Id.* at 158:19-22.

At 7:45 A.M. on August 27, 2016, Patterson once again complained to a nurse making medical rounds. Stump Aff. 13, Ex. 7 Doc. # 103-7. The nurse again noted that his lower left extremity did not display redness but was ashen in color and cool to the touch. *Id.* The nurse performed several other tests before notifying the doctor of this change in condition. *Id.* After advising the doctor of the changes, orders were immediately handed down directing Patterson to be sent to Mercy Medical Center for evaluation and treatment. *Id.* By 8:30 that morning, Patterson was in transit to the hospital. *Id.* He was quickly tested and the vascular surgeon on

staff determined that he was to be admitted and taken straight into surgery. *Id.* Unfortunately, a decision was made to amputate Mr. Patterson's leg on August 29, 2016. Compl. ¶ 4, Doc. # 85. The affidavit filed by Patterson's doctor on his behalf suspected that if Patterson had gotten treatment earlier, there was a "high probability that [Patterson's] leg could have been saved." Butler Aff., 5, Doc. # 107-1. He further opined that "the need for medical attention should have been apparent." *Id.*

## B. Procedural Background

Following the aforementioned events, Patterson filed this matter naming numerous defendants. Patterson brought claims against Correctional Health Care Group, Inc. and several of its employees, both doctors and nurses, for their roles in his alleged mistreatment. He also brought constitutional claims pursuant to 42 U.S.C. § 1983 against several Stark County deputies and correctional officers in their individual capacities. They were employed at the Stark County jail during the events in question and several of them had personally interacted with Patterson during his stay. Finally, seeking to impose municipal liability on Stark County, Patterson also brought claims against Sheriff George T. Maier, Lieutenant Rick Ady, and Stark County Commissioners in their official capacities. Patterson ultimately entered into a settlement agreement with several defendants and voluntarily dismissed others, leaving both individual and official capacity claims against the current defendants to be decided on summary judgment.

## II. ANALYSIS

### A. Standard of Review

Fed. R. Civ. P. 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Parties must rely on materials in the record, such as "depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory, or other materials" to support or refute the motion. Fed. R. Civ. P. 56(c)(1); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). There is no genuine issue of material fact to be tried if the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (citing *Matsushita Elec. Indus., Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992). At the summary judgment phase, a court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.*" Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008).

### B. <u>Constitutional Claim under 42 U.S.C. § 1983</u>

"To prevail on a cause of action under § 1983, a plaintiff must prove (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010)). Neither party contests that the individual defendants' actions satisfy the color of law requirement. At issue in this case is Plaintiff's claim that Defendants' failure to provide adequate medical care violated his right to be free from cruel and unusual punishment under the Eighth Amendment. "The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs[.]" *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Eighth Amendment claims under § 1983 are governed by the deliberate indifference

standard. See *Farmer v. Brennan*, 501 U.S. 825, 834-36 (1994). "Deliberate indifference requires that the defendants 'knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety.'" *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009) (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001)).

The standard of deliberate indifference has both objective and subjective elements. *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (citing *Spears*, 589 F.3d at 254). "For the objective component, the detainee must demonstrate the existence of a sufficiently serious medical need." *Spears*, 589 F.3d at 254. (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005)). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004)). Physical manifestations and complaints of symptoms of serious irregularity are generally considered to be obvious enough to put a lay person on notice of a serious medical need. See *Harrison*, 539 F.3d at 518-19 ("[t]he symptoms associated with an asthma attack--wheezing, difficulty breathing, tightness in the chest--are quite obvious and recognizable even to a lay person."); *Blackmore*, 390 F.3d at 899-900 (finding that complaints of sharp and severe stomach pain and vomiting were sufficiently obvious in that they were "the classic signs of appendicitis."); *Estate of Carter*, 408 F.3d at 311. (complaints of serious chest pain spanning several hours are "classic signs of an impending heart attack."); *Newberry v. Melton*, 726 F. App'x. 290, 295 (6th Cir. 2018) (frequent, lengthy, and aggressive seizures causing bruises, cuts, vomiting, and inability to breathe are manifestations that satisfy the objective elements of the deliberate indifference test.); *Barner v. Mackie*, 2017 U.S. App. LEXIS 22082, at *6 (6th Cir. Nov. 2, 2017) ("[Plaintiff's] statements

that he had high blood pressure, along with medications to treat it, could lead one to reasonably infer that a physician diagnosed him as needing treatment for high blood pressure—a serious medical need.").

The subjective component requires a plaintiff to show that the defendants had a sufficiently culpable mental state. *Farmer*, 511 U.S. at 834. In the realm of Eighth Amendment § 1983 jurisprudence, that mental state manifests as "deliberate indifference to inmate health or safety." *Id.* This requirement goes beyond that of mere negligence but does not require proof of intent to cause harm. See *Shadrick*, 805 F.3d at 737. To show deliberate indifference, the plaintiff must "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Nallani v. Wayne County*, 665 F. App'x 498, 506 (6th Cir. 2016) (quoting *Comstock v. McCrary*, 273 F.3d 693, 702-03 (6th Cir. 2001)). To identify whether a sufficiently culpable state of mind existed to satisfy the subjective component, courts must examine the conduct of each individual defendant. See, *e.g., Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 570 (6th Cir. 2013). The plaintiff ultimately bears the burden of proving subjective knowledge, but that burden may be satisfied by circumstantial evidence. *Comstock*, 273 F.3d at 703. (citing *Farmer*, 511 U.S. at 842). It is not necessary to show that an official was specifically aware of the exact potential outcome of his action or omission, only that serious risks accompanied a plaintiff's symptoms. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009).

Additionally, correctional staff are entitled to reasonably rely on the medical advice and judgment of healthcare personnel and generally do not commit acts of deliberate indifference when adhering to such advice. *Winkler*, 893 F.3d at 895 (citing *McGaw v. Sevier County*, 715 F.

App'x 495, 498-99 (6th Cir. 2017)); see also *Spears*, 589 F.3d at 255 (concluding that nonmedical jail personnel are entitled to reasonably rely on the assessments made by the medical staff). This is consistent with the often-stated principle that the subjective component of Eighth Amendment claims should be used to limit the constitutionalization of medical malpractice. See *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446-47 (6th Cir. 2014) (citing *Comstock*, 273 F.3d 693 at 703). Keeping these principles in mind, the Court will address whether Patterson can meet the objective and subjective elements of his claim.

i.     **The Objective Component**

Patterson argues that the condition in his left leg while he was at the Stark County jail was an objectively serious medical need. Patterson asserts that his numerous complaints of pain and pleas for medical care, coupled with the discoloration of his foot over time, were sufficiently obvious to put the COs and deputies on notice that he was suffering from a serious medical condition. Patterson further offers the alleged comment by a CO asking if his foot was "gangrene." Finally, Patterson points to the fact that his complaints led other inmates to hit the "panic button" in their cell on his behalf as evidence that his medical needs were serious and obvious. Defendants contend that the condition was not as obvious as Patterson claims. They argue that, to their knowledge, Patterson was already receiving medical attention. Additionally, Defendants argue that the non-medical staff could not have known that Patterson's condition was serious because the judgment and actions of the medical staff did not indicate so. Defendants also maintain that other inmates pressed the "panic button" out of annoyance rather than altruism.

Construing the facts most favorably to Patterson, the objective component can be satisfied for purposes of summary judgment. This case is both analogous to and distinguishable

from *Barner*. In *Barner*, an inmate was not given a medical examination after being transferred from a guidance center to a correctional facility. *Barner*, U.S. App. LEXIS 22082, at *2. The inmate had high blood pressure and allegedly ran out of his previously issued medication after several days. *Id.* He waited a week before filling out a medical kite informing staff of his ailment and requesting additional medication. *Id.* The medication was ordered but not administered until one week later, when the inmate complained about stress, severe headaches, and shortness of breath and dizziness. *Id.* On review, the court found that the objective element was met because his statement that he had high blood pressure and medications to treat it "could lead one to reasonably infer that a physician diagnosed him as needing treatment for high blood pressure—a serious medical need." *Id.* at *6.

Here, Patterson was given a medical examination upon arrival at the Stark County jail. He immediately informed the staff of his many ailments. He specifically named several of his medications to jail staff and indicated who his prescribing doctor was and which pharmacy he could get his medication at. He later filled out a medical kite including as much of this information as possible. The record indicates that Patterson manifested physical symptoms of his ailments, including pain, limping, and discoloration, and that at least some of the defendants were privy to this information. In addition, his constant requests for medical attention and the CO's surprised reaction to the deterioration in Patterson's foot could reasonably indicate that his condition was sufficiently serious in nature to put the jail staff on notice of his need for medical assistance. The actions of other inmates in hitting the panic button in response to Patterson's complaints may well have been out of annoyance rather than a laymen's diagnosis of serious medical needs, as he himself concedes. However, in light of the other evidence available, this contention is not dispositive. Construing the facts most favorably to the non-moving party, as

this motion requires, Patterson can satisfy the objective component of his claim. The analysis continues with the subjective component.

## ii. The Subjective Component

### a. Sgt.'s Stevic and Burress; CO's Skelley and Jones

The record provides very little information about the above-named defendants. There is nothing to indicate specifically that CO Jones had ever interacted with Patterson, much less was subjectively aware of a serious risk to his health. CO Skelley was the shift officer for Patterson's unit directly following CO Boggs. Although Patterson complained to CO Boggs of his condition several times, the record does not indicate that he ever specifically complained to CO Skelley, or otherwise took steps to make Skelley aware of his condition. The record indicates that Skelley was given a cursory notice of Plaintiff's complaints from the outgoing officer. Even so, there is insufficient evidence to conclude that CO Skelley's conduct ever rose to the level of negligence, much less that of deliberate indifference.

Similarly, the record is sparse as to what, if any, role Stevic and Burress played in this matter. Both acted in supervisory roles, but the record does not indicate that they ever personally interacted with Patterson. At most, the record demonstrates that they may have signed off on the daily logs written by the COs, some of which briefly recorded Patterson's complaints of leg pain. There simply is insufficient evidence to establish that Sgt. Stevic or Sgt. Burress were ever subjectively aware of a serious risk to Patterson's health, and thus their conduct does not rise to the level of deliberate indifference.

### b. Sgt. Changet

Sgt. Changet was the shift supervisor on duty at several times during Patterson's stay at the jail. Changet never had a direct interaction with Patterson, nor was he contacted by another

CO regarding Patterson's condition. Changet's sole action taken in relation to Patterson was that he approved the transfer to medical segregation on the recommendation of medical staff. The record does not demonstrate that Sgt. Changet was subjectively aware, either directly or by circumstance, of Patterson's alleged serious medical need. Even if he was aware, his approval of Patterson's transfer to medical segregation based on the recommendation of nursing staff indicates clearly that he did not disregard any serious risk to Patterson's health. Changet, as a laymen correctional officer, was also entitled to rely on the reasonable medical judgment of the jail nursing staff. His conduct in this matter does not satisfy the subjective component necessary for Patterson's claim to succeed.

### c. Sgt. Evanoff

Sgt. Evanoff's first contact with Patterson was during the "shakedown" the night before Patterson was sent to the emergency room. The record does not indicate that Sgt. Evanoff had discussed Patterson's complaints or medical status with anyone prior to conducting this shakedown. At most, Evanoff heard Patterson's complaints and noticed his limp during the shakedown. There is no indication that he was informed of or viewed the purported deterioration in Patterson's leg and foot. The record does not demonstrate that Evanoff was aware of facts, outside of Patterson's own verbal complaints, that would lead him to infer that Patterson faced a substantial risk of harm. Nor did Evanoff ever appear to actually draw any inferences. The only inference that the record supports is that Evanoff recognized that Patterson was already in the medical segregation unit, and thus had already been assessed by the jail's medical staff. His remarks to Patterson support only this inference. Accordingly, Patterson cannot establish the elements of his deliberate indifference claim against Evanoff.

### d. CO Smith

Smith's interaction with Patterson similarly does not rise to the level of deliberate indifference. Smith and a nurse responded to Patterson's complaints early on August 26, 2016. Smith witnessed the nurse assess Patterson's leg and foot and also helped him into a wheelchair to transfer him to see a doctor. He wheeled Patterson to medical segregation after being directed to do so by the nurse, but he was not in a position to question the assessment of a trained medical professional. Smith's own admissions in deposition indicate that the general policy of the jail was for the correctional staff to rely on the decisions and expertise of medical staff in these situations. Smith's actions were clearly in reliance on the assessment and opinion of the jail's medical staff, and the record does not indicate that Smith had reason to know that this medical assessment was improper or insufficient. The record demonstrates that CO Smith reasonably responded to, rather than disregarded, Patterson's complaints. Patterson's claim against him, therefore, cannot succeed.

### e. CO Pittman

Patterson relies on CO Pittman's alleged gangrene comment regarding his foot to indicate that Pittman was aware of the seriousness of the condition and his failure to act on that awareness constituted deliberate indifference. Patterson wholly ignores the fact that this comment was allegedly made in the presence of a nurse who had recently examined him. Pittman knew that Patterson was in medical segregation, had been assessed by trained medical staff, and that the nurse had put Patterson on a list to see a doctor when one was available. He had no reason to believe that the assessment and treatment provided by medical staff was inappropriate. See *Spears*, 589 F.3d at 255. Patterson argues that Pittman should have contacted his supervisor and provided Patterson with a grievance form to appeal his medical assessment. The record does

not indicate that Patterson ever requested a form. Moreover, Patterson has offered no basis to suggest that his condition was so dire that Pittman should have known and in fact knew that the medical assessment was improper. As noted above, CO Pittman was entitled to reasonably rely on the opinion of medical staff, which he did. Accordingly, Patterson's claim against Pittman fails.

### f. CO Boggs

Even viewing the facts of Patterson's encounter with CO Boggs in a light most favorable to him, as this Court must, Boggs' conduct in this instance does not rise to the level of deliberate indifference. To start, there is no evidence in the record beyond Patterson's own verbal complaints that might have made Boggs subjectively aware of the seriousness of Patterson's condition. Patterson has offered no evidence to show that Boggs ever inferred that he was at a substantial risk of harm. However, where an inmate has shown that a serious medical need existed that was not addressed in a reasonable amount of time, deliberate indifference may be present. See *Blackmore*, 390 F.3d at 900. The record before the Court does not support that finding. Boggs witnessed Patterson's ordeal at its outset. Following Patterson's short time with Boggs, he spent over two days with other correctional staff. Patterson was subsequently examined multiple times by nurses and over a day passed before he was moved to medical segregation and placed on a list to see a doctor. If Patterson did have a serious medical risk, and the risk was not addressed within a reasonable timeframe, it was not the fault of a relatively short initial delay on Boggs' watch. Additionally, the record indicates that Boggs did not delay Patterson's treatment at all, but rather orally notified medical staff of Patterson's complaints. Boggs' conduct, even viewed in a light most favorable to Patterson, does not equate to a constitutional violation.

## C. Qualified Immunity

Defendants argue that they are entitled to qualified immunity because their actions did not violate a clearly established constitutional right. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Estate of Carter*, 408 F.3d at 310. (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In order to overcome a qualified immunity defense, a plaintiff must establish that: (1) the alleged conduct violated a constitutional right, and (2) the right was clearly established at the time of its violation." *Bonds v. Daley*, 2019 U.S. App. LEXIS 14863, at *6-7 (6th Cir. May 17, 2019) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Courts have discretion to decide, based on the circumstances of the individual case, which prong of the analysis should be addressed first. *Pearson*, 555 U.S. at 236.

This Court has analyzed Plaintiff's Eighth Amendment claims above and found that Plaintiff cannot satisfy the subjective component of his claim with respect to any defendant. Without satisfying both components of a deliberate indifference claim, Plaintiff cannot show that any of the individual defendants have violated a constitutional right. Accordingly, this Court need not analyze Defendants' qualified immunity defenses.

## D. <u>Municipal Liability</u>

Plaintiff next argues that Stark County is liable for a constitutional violation under 42 U.S.C. § 1983 pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). It is well settled that municipalities are not subject to respondeat superior liability in § 1983 actions. See *Id.* at 691. Rather, municipal liability under § 1983 may arise "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

said to represent official policy, inflicts the injury. . . " *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 493 (6th Cir. 2008) (quoting *Monell*, 436 U.S. at 694). To establish municipal liability, a plaintiff may demonstrate the requisite policy or custom by showing: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Burgess,* 735 F.3d at 478 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). Several cases in this circuit have held that in the absence of a constitutional violation, there can be no municipal liability. See *Thomas*, 854 F.3d at 367. ("No constitutional violation means no municipal liability."); *Thornton v. City of Columbus*, 727 F. App'x. 829, 838 (6th Cir. 2018) ("Because no constitutional violations occurred, the district court properly granted summary judgment on [the plaintiff's] § 1983 claims against the City."); *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) ("Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm."). Having found above that there exists no valid claim against the individual defendants, Patterson's *Monell* claim cannot survive.

III.    **CONCLUSION**

For the reasons stated above, this Court GRANTS Defendants' Motion for Summary Judgment with respect to each defendant.  Judgment on the complaint is hereby entered in favor of Defendants.

IT IS SO ORDERED.

DATED:  2/4/2020                                              */s/ John R. Adams*_____
                                                                           John R. Adams
                                                                           UNITED STATES DISTRICT JUDGE